AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>996,726 BARRELS OF PETROLEUM-<br>PRODUCT AT JANAF STORAGE<br>FACILITY IN CROATIA | )<br>)<br>)<br>)<br>) |

Case No.     23-sz-15

## APPLICATION FOR A WARRANT TO SEIZE
## PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the <u>Jurisdiction of the</u> District of <u>Columbia</u> is subject to forfeiture to the United States of America under <u>18</u> U.S.C. § <u>2339B(a)(1)</u>

(describe the property): 996,726 BARRELS OF PETROLEUM-PRODUCT CARGO AT JANAF STORAGE FACILITY IN CROATIA

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

❑ Continued on the attached sheet.

_____
*Applicants' signatures*

Cindy Burnham, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    06/10/2023

_____
*Judge's signature*

City and state:    Washington, D.C.

G. Michael Harvey, United States Magistrate Judge
*Printed name and title*

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br><br>996,726 BARRELS OF<br>PETROLEUM-PRODUCT AT JANAF<br>STORAGE FACILITY IN CROATIA | )<br>)<br>)<br>)<br>) Case No.  23-sz-15<br>)<br>) |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the _____ Jurisdiction of the _____ District of _____ Columbia _____ be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

996,726 BARRELS OF PETROLEUM-PRODUCT CARGO AT JANAF STORAGE FACILITY IN CROATIA

I find that the affidavit establishes probable cause of a violation of 18 U.S.C. Section 2339B(a)
(1) and probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before _____ 06/24/2023 _____
*(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to _____ G. Michael Harvey _____ .
*(United States Magistrate Judge)*

❏ Pursuant to U.S.C. 2339B(a)(1), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days (not to exceed 30)   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____ 06/10/2023 6:00 pm _____      _____
*Judge's signature*

City and state:   _____ Washington, D.C. _____      G. Michael Harvey, United States Magistrate Judge
*Printed name and title*

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br><br>23-sz-15 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of: | | |
| Inventory of the property taken: | | |

| Certification |
|---|
| I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br>Date: _____<br><br><br>_____<br>*Executing officer's signature*<br><br>_____<br>*Printed name and title* |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF 996,726 BARRELS OF PETROLEUM-PRODUCT AT JANAF STORAGE FACILITY IN CROATIA | CASE NO. 23-sz-15 <br><br> FILED UNDER SEAL |

**AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT**

I, Cindy Burnham, a Special Agent with Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws. I have been an Agent with the FBI since April 2006. Since that time, I have been involved in national security investigations. Specifically, I have been involved in investigations involving counterintelligence, export violations, and counterproliferation. During my work with the FBI, I have executed, or participated in the execution of search warrants and have seized evidence of criminal violations. I have conducted and participated in other investigations related to violations of U.S. export laws and regulations, and sanctions violations. I have been involved in investigations involving the illegal export of controlled items, as well as investigations involving the illegal use of the U.S. financial system to facilitate petroleum sales for the benefit of the Government of Iran.

2.      Based upon my training and experience, I am familiar with the methods of operation employed by subjects in national security investigations to obfuscate their involvement in transactions for the purpose of circumventing sanctions imposed by the United States and the United Nations ("UN").

3.      I have been one of the case agents in this investigation, which is worked jointly with the Department of Homeland Security, Homeland Security Investigations. The information obtained over the course of the investigation has revealed designated entities are violating U.S. laws and regulations by (1) trafficking in oil products for the benefit of the Islamic Revolutionary Guard Corps ("IRGC") and the Qods Force of the Islamic Revolutionary Guard Corps ("IRGC-QF"), a designated foreign terrorist organization; and (2) attempting and conspiring to launder monetary instruments in support of the same, including by sending wire transfers through correspondent accounts at U.S. financial institutions facilitating the criminal conduct. During my work on this investigation, I have reviewed reports prepared by agents and discussed this case and other related cases with agents, law enforcement officers, and partners at other U.S. Government agencies who have been involved in these investigations. I submit this affidavit based upon personal knowledge derived from my participation in this investigation, and information that I have received from a variety of other sources, including law enforcement officers and agents, witness interviews, public records, bank records, and documents discussed herein.

## I.     PURPOSE OF AFFIDAVIT

4.     This affidavit is made in support of a seizure warrant for petroleum product (the "Target Property") currently stored at a storage facility owned by JANAF Plc. in Croatia, which is estimated to be approximately 996,726 barrels of crude oil.

5.     As further described herein, the Target Product was obtained from sanctioned Iranian entities, as follows:

a.     A confidential source ("CS")[1], who is an expert in the field of oil cargo shipments and who has proven reliable on other cases, reviewed the Automatic Identification System ("AIS")[2] data and imagery for the M/T BERG 1 (IMO No. 9262168) ("BERG 1").[3] The CS indicated that according to satellite imagery, on or about January 16, 2022, the BERG 1 berthed at Kharg Island, Iran, and loaded petroleum cargo until on or about January 18, 2022. The BERG 1 was loaded with the Target

---

[1] To date, this CS and the CS's company have been paid by FBI and HSI approximately $175,000 for time and professional services in this investigation and related investigations. The CS has also been reimbursed for travel costs incurred in related investigations.

[2] AIS is a standard maritime system that it utilized by all vessels to broadcast vessel type, position, speed, direction, etc. for navigational safety purposes, much like commercial airlines utilize transponder data. The system was introduced primarily for safety reasons by helping government authorities to identify vessels, assist in search and rescue operations as well as provide supplementary information from other navigational systems such as radar. AIS automatically transmits the ship's position and a timestamp. The ship's operator may also manually update the navigational status, ship's draft, hazardous cargo information, destination and ETA, and waypoints. *See* https://www.marinetraffic.com/blog/information-transmitted-via-ais-signal.

[3] Tankers have certain signatures that make them identifiable, and the CS reviewed reference images of the vessels at issue to be able to identify them in satellite imagery.

Propery, as indicated by her draft increase from 11.5 meters to 20.2 meters, then to 20.5 (showing that the vessel was laden with cargo).

b. The CS indicated that satellite imagery shows on February 15, 2022, the BERG 1 began a ship-to-ship transfer ("STS") with MARIA GRACE (IMO No. 9224271) ("MARIA GRACE") in the Ria Archipelago.

c. From March 15-18, 2022, the MARIA GRACE engaged in an STS with the CS PROSPERITY ("CS PROSPERITY," IMO 9169691), a Floating Storage & Offloading (FSO) vessel. The CS PROSPERITY took on the Target Property.

d. On March 18, 2022, the CS PROSPERITY engaged in an STS with the OKEANOS (IMO 9232931) off the Strait of Malacca and departed for Omisalj, Croatia, laden with the Target Property.

e. According to records of JANAF, the OKEANOS arrived in Croatia on or about April 22, 2022, and deposited the Target Property at the JANAF storage facility, where it is currently held.

6. The Target Property is a source of influence over the National Iranian Oil Company ("NIOC"), the Iranian Oil Terminals Company ("IOTC"), the Islamic Revolutionary Guards Corps ("IRGC"), and the IRGC-Qods Force ("IRGC-QF") within the meaning of 18 U.S.C. § 981(a)(1)(G)(i). In transferring the Target Property for the purposes of sale, IOTC, and therefore, NIOC, provided or attempted to provide resources to IRGC and IRGC-QF, in violation of 18 U.S.C. § 2339B(a)(1). Any conveyance of the Target Property is also an attempt to provide

resources to IRGC-QF, in violation of 18 U.S.C. § 2339B(a)(1). Such attempted transactions also constitute money laundering.

7.      There is probable cause to believe the Target Property is subject to both criminal and civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), 18 U.S.C. § 981(a)(1)(A), 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c). Specifically, the Target Property affords the chartering party a source of influence over a foreign terrorist organization and is property involved in and/or facilitating money laundering offenses and constitutes "proceeds traceable" to a specified unlawful activity (*i.e.*, material support of a designated terrorist organization).

## II.      LEGAL AUTHORITIES

8.      This application seeks a seizure warrant under both civil and criminal authorities because the Target Property consists of a transferrable product that is currently held aboard an oceangoing vessel, and thus it could easily be placed beyond process if not seized by a warrant.

9.      Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under § 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," if there is probable cause to believe the property is subject to forfeiture. Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for criminal forfeiture proceedings. Section 853(f) of Title 21 permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

### A.      Terrorism Forfeiture Authorities

10.      Pursuant to 18 U.S.C. § 981(a)(1)(G)(i), "[a]ll assets, foreign or domestic … of any individual, entity, or organization engaged in planning or perpetrating any … Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the

United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization" are subject to forfeiture to the United States.

      a.  Section 981(a)(l)(G)(i) thus covers two categories of property: (1) all assets, foreign or domestic, of individuals, entities, or organizations engaged in planning or perpetrating federal crimes of terrorism; and (2) all assets, foreign or domestic, that afford any person a source of influence over an entity or organization engaged in planning or perpetrating any federal crime of terrorism. *See, e.g.*, *United States v. All Petroleum-Product Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, Civil Action No. 20-1791 (JEB), 2021 U.S. Dist. LEXIS 189395, at *12-13 (D.D.C. Oct. 1, 2021) ("The Court concludes, as a result, that Defendant Properties likely afforded Madanipour and Mobin a source of influence over the IRGC because those properties were critical to furthering the affairs of the terrorist group's enterprise. The Government thus properly brought this action for forfeiture against under 18 U.S.C. § 981(a)(1)(G)(i).") (citations omitted).

11.    Among the government's forfeiture authorities, the terrorism forfeiture provision applies to the broadest range of property. Specifically, Section 981(a)(1)(G)(i) provides for the forfeiture of *all* property, foreign or domestic, of a person or group engaged in a crime of terrorism or that affords a person a source of influence over a group engaged in a crime of terrorism, irrespective of whether the property has any nexus to a crime or to the United States. *See, e.g., United States v. One Gold Ring with Carved Gemstone*, Civil Action No. 16-CV-02442-TFH, 2019 U.S. Dist. LEXIS 195423, at *1-2 (D.D.C. Nov. 7, 2019) ("§ 981(a)(1)(G)(i) covers all property 'foreign or domestic.' That is, the statute empowers the government to seek the forfeiture of

property outside the United States, which may have never touched the United States.  The broad expanse of this language is for forfeiture actions to reach all property of terrorist organizations.").

**B.**     **Money Laundering Forfeiture**

12.     Property that is involved in a money laundering offense is subject to forfeiture under both civil and criminal authorities.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property" is subject to forfeiture to the United States.  Similarly, 18 U.S.C. § 982(a)(1) provides that the "[t]he court, in imposing a sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."

13.     Money laundering forfeiture extends to all property "involved in" a money laundering offense.  To show that the property was "involved in" such a violation, the United States must show "a substantial connection between the property and the offense."  18 U.S.C. § 983(c)(3).  When the laundering transaction is a purchase, sale, exchange, or disbursement, the property that is bought, sold, exchanged, or otherwise the subject of the transaction is deemed to be "involved in" the offense.  *See, e.g.*, *United States v. Real Prop. Identified As: Parcel 03179-005R*, 311 F. Supp. 2d 126, 130 (D.D.C. 2004) ("[T]he Court concludes that the government has demonstrated that the aircraft was involved in a monetary transaction [a payment of specific unlawful activity proceeds to release a lien on the aircraft] involving the proceeds of specified unlawful activity.  Clearly, this involvement renders the aircraft subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).").

### III.   JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1355(a), which provides that [t]he district courts shall have original jurisdiction … of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress …"  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States."

15.    This Court has *in rem* jurisdiction over the Target Property and venue lies in this Court pursuant to 28 U.S.C. § 1355(b)(2), which provides that "[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought … in the United States District Court for the District of Columbia."  *See, e.g.*, *One Gold Ring with Carved Gemstone*, 2019 U.S. Dist. LEXIS 195423, at *2 ("This court is the sole jurisdiction where such litigation is properly lodged. 28 U.S.C. § 1355(b)(2).").  To the extent that the Target Property is seized upon the high seas, this Court additionally has jurisdiction pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b).  *See, e.g.,* *United States v. All Petroleum-Product Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, No. 20-1791, 2020 U.S. Dist. LEXIS 120727, at *2 (D.D.C. July 2, 2020) ("WHEREAS, this Court has venue and jurisdiction over the Defendant Properties: (i) as they are located in a foreign country or have been detained by a foreign authority, pursuant to 28 U.S.C. § 1355(b)(2); and/or (ii) as they are on the high seas, pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b)[.]").

IV.   **PROBABLE CAUSE**

16.   As described further herein, the Target Property originated from Iran, and its transfer was facilitated by sanctioned Iranian entities in support of a designated terrorist organization.

A.   **APPLICABLE U.S. DESIGNATIONS AND SANCTIONS AGAINST IRGC AND THE IRGC-QF**

*Terrorism Sanctions by the U.S. Department of State*

17.   On April 15, 2019, the United States Secretary of State designated the IRGC as a Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and Nationality Act. The designation noted that the IRGC actively finances and promotes terrorism, and noted that "the IRGC—most prominently through its Qods Force—has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." Further, the designation note that "The IRGC has been *directly involved* in terrorist plotting; its support for terrorism is foundational and institutional, and it has killed U.S. citizens. It is also responsible for taking hostages and wrongfully detaining numerous U.S. persons, several of whom remain in captivity in Iran today." To date, the IRGC remains a designated FTO. [4]

---

[4] This FTO is also known as Islamic Revolution Guards Corps; Iran's Revolutionary Guard Corps; Islamic Revolutionary Corps; IRG; The Iranian Revolutionary Guards; Islamic Revolutionary Guards; Iran's Revolutionary Guards; Revolutionary Guards; Revolutionary Guard; Army of the Guardians of the Islamic Revolution; The Army of the Guardians of the Islamic Revolution; AGIR; Pasdaran; Pasdaran-e Inqilab; Pasdarn-e Enghelab-e Islami; Sepah; Sepah Pasdaran; Sepah-e Pasdaran-e Enghelab-e Eslami; Sepah-e Pasdaran Enghelab Islami; Islamic Revolutionary Guard Corps-Qods Force; IRGC-Quds Force; IRGC-QF; Qods Force; Sepah-e Qods; Jerusalem Force; Al Qods; Islamic Revolutionary Guard Corps (IRGC)-Qods Force; Pasdaran-e Enghelab-e Islami (Pasdaran); Sepah-e Qods (Jerusalem Force); Qods (Jerusalem) Force of the IRGC; Quds Force; IRGC Ground Forces; Islamic Revolution Guards Corps Ground Force; Basij; Baseej; Basij-e Melli; Islamic Revolution Guards Corps Resistance Force; Basij Resistance Forces; Mobilization of the Oppressed; Mobilization of the Oppressed Unit; Mobilization of the Oppressed Organization; Organization of the Mobilisation of the Oppressed; Sazman Basij Melli; Sazman-e Moghavemat-e Basij; Sazeman-e Basij-e Mostazafan; Vahed-e Basij-e Mostazafeen; Vahed-e

18.     According to publicly-available information issued by the Director of National Intelligence, the IRGC-QF is "one of the Iranian regime's primary organizations responsible for conducting covert lethal activities outside of Iran, including asymmetric and terrorist operations. Iran views terrorism as a tool that it can use to support its efforts to deter and counter its perceived foes, assert leadership over Shia Muslims worldwide, and project power in the Middle East." The same source notes that IRGC-QF has "plotted and conducted covert operations worldwide, and it provides guidance, training, funding, and weapons to Shia militant partners and proxies in other Middle Eastern countries. These partners and proxies offer the IRGC-QF a measure of deniability and increase its ability to operate around the world." *See Counter Terrorism Guide*, Office of the Director of National Intelligence, *available at* https://www.dni.gov/nctc/ftos/irgc_fto.html.

19.     According to information provided by the U.S. Senate Committee on Foreign Relations, the IRGC was designated "as a foreign terrorist organization (FTO) in April 2019 because of its acts of global terror, violations of the laws of armed conflict, assassination attempts, and support for regional terrorist groups." *Press Release of Mar. 23, 2023*, U.S. Senate Cmt. Foreign Relations, *available at* https://www.foreign.senate.gov/press/rep/release/risch-colleagues-encourage-eu-to-designate-irgc-as-terrorist-organization.

### Treasury Department Sanctions

20.     On October 25, 2007, the Department of the Treasury designated the IRGC-QF pursuant to Executive Order ("E.O.") No. 13224 for providing lethal support to multiple terrorist

---

Basij Mostaza'feen; National Mobilization Organization; National Resistance Mobilization; Resistance Mobilization Force; Nirooye Moghavemate Basij; Niruyeh Moghavemat Basij; IRGC Air Force; Islamic Revolution Guards Corps Air Force; Islamic Revolutionary Guards Corps Air Force; Islamic Revolutionary Guard Corps Air Force; IRGCAF; Sepah Pasdaran Air Force; Air Force, IRGC (Pasdaran); Islamic Revolutionary Guards Corps Aerospace Force; Aerospace Force of the Army of the Guardians of the Islamic Revolution; AFAGIR; Aerospace Division of IRGC; IRGC Aerospace Force; IRGCASF; IRGC Navy; Islamic Revolution Guards Corps Naval Force.

organizations. That same day, the Department of the Treasury also designated the IRGC pursuant to E.O. No. 13382 for its support of Iran's ballistic missile and nuclear programs.

21.     On March 14, 2016, the Department of the Treasury designated the National Iranian Oil Company ("NIOC") pursuant to E.O. No. 13599, which targets the property of the Government of Iran.

22.     On October 13, 2017, the Department of the Treasury designated the IRGC pursuant to E.O. No. 13224 for providing material support to the IRGC-QF, including by providing training, personnel, and military equipment.

23.     On November 5, 2018, the Department of the Treasury designated NIOC's subsidiary, NITC, pursuant to E.O. No. 13599 for its connections to the Government of Iran and its role in the Iranian shipping sector. A previous Department of the Treasury press release noted that NIOC was owned by the Government of Iran through the Ministry of Petroleum, and was responsible for the exploration, production, refining, and export of oil and petroleum products in Iran. It further noted the close relationship between the IRGC and NIOC. Similarly, a previous Department of the Treasury press release noted that NITC was a Government of Iran entity, which employed various front companies.

24.     On January 23, 2020, the Department of the Treasury described NIOC as "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's [IRGC-QF] and its terrorist proxies."

25.     On October 26, 2020, the Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, designated NITC and NIOC pursuant to counter-terrorism sanctions for their financial support to Iran's IRGC-QF.

26.     According to the Department of the Treasury's statements related to IRGC designations, the IRGC and its major holdings are a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the oil industry.

27.     On February 9, 2023, OFAC designated Singapore-based Unicious Energy PTE. Ltd.. Treasury stated that Unicious served an important role in Iran's petroleum network, coordinating millions of dollars in petroleum-related payments for other companies within the network and aiding other sanctioned entities in the sale of hundreds of millions of dollars of petroleum products. According to documents provided by Unicious's owner to JANAF, Unicious Energy PTE is 100% owned by Mohamed Siddique Mohamed Sabil. The same individual disclosed to JANAF that he is also the 100% owner of Unicious S.A., based in Switzerland.

**B.     IRANIAN CRUDE OIL IS AN ASSET OF IOTC, NIOC, AND IRGC-QF**

28.     On August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. During Qasemi's appointment to this position, the Department of the Treasury has noted the close connection between the IRGC and the Iranian petrochemical sector on multiple occasions.

29.     On September 24, 2012, the Department of the Treasury submitted a report to Congress, as required by the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), informing Congress that the Department of the Treasury determined that NIOC was an agent or affiliate of the IRGC.

30.     In 2014, the Department of the Treasury further noted that the IRGC's influence had grown within NIOC.

31.     Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia Construction Headquarters, a construction and development wing of the IRGC that generates

income and funds operations for the IRGC. During his role as Minister of Petroleum, Qasemi publicly stated his allegiance to the IRGC and the IRGC became increasingly influential in Iran's energy sector. For example, Khatam Al-Anbia obtained billions of dollars' worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process. *See* https://ir.usembassy.gov/our-relationship/official-reports/treasury-report-nioc-nitc/. Although Qasemi no longer leads the IRGC-QF in its Iranian oil sales,[5] based on information obtained in this and other investigations, including legally obtained chat and email messages, I believe that other IRGC-QF leaders have taken on the role of managing Iranian oil sales for the IRGC-QF.

32.     On June 7, 2019, OFAC sanctioned Persian Gulf Petrochemical Industries Company ("PGPIC") for providing financial support to Khatam al-Anbia. PGPIC is Iran's largest and most profitable petrochemical holding group. PGPIC and its group of subsidiary petrochemical companies hold 40 percent of Iran's total petrochemical production capacity and are responsible for 50 percent of Iran's total petrochemical exports. Regarding this action, Treasury Secretary Steven T. Mnuchin stated, "By targeting this network we intend to deny funding to key elements of Iran's petrochemical sector that provide support to the IRGC . . . This action is a warning that we will continue to target holding groups and companies in the petrochemical sector and elsewhere that provide financial lifelines to the IRGC."

33.     OFAC has additionally stated that Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and fund its malign activities throughout the Middle East and that Iran's petrochemical and petroleum sectors are primary sources of funding

---

[5] According to open sources, Qasemi died on December 8, 2022, in Beijing, China, after reportedly suffering from cancer.

for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people. *See* https://home.treasury.gov/news/press-releases/sm885.

34.     OFAC has also noted that crude oil and condensate sold by the IRGC-QF originates with NIOC, and that the IRGC-QF relies on persons embedded within the shipping industry to keep this oil moving by ensuring that vessel insurance and registration are in order, among other things. Furthermore, NITC vessels have been used in IRGC-QF-run operations. *See* https://home.treasury.gov/news/press-releases/sm767.

35.     OFAC has also noted that a complex network of intermediaries enables the IRGC-QF to obfuscate its involvement in selling Iranian oil and that in spring 2019 alone, one IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil and had taken steps to hide Iranian, IRGC, and NIOC involvement in certain transactions. These shipments, taken collectively, sold for more than half a billion dollars. The same network also sold nearly 4 million barrels of condensate and hundreds of thousands of barrels in gas oil, bringing in another quarter billion dollars.

36.     OFAC has additionally stated that the profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad and that the IRGC systemically infiltrates critical sectors of the Iranian economy to enrich their coffers, while engaging in a host of other malign activities. *See* https://home.treasury.gov/news/press-releases/sm703.

37.     Based on information developed in other investigations, I have reviewed legally obtained evidence showing that senior IRGC-QF leadership take an active role in directing transfers of Iranian oil for sale. Specifically, I have reviewed chat messages and email

communications showing that such IRGC-QF leaders have been in direct conversations with both buyers of Iranian oil products and middleman moving the same, and further that IRGC-QF leaders have negotiated sale contracts related to the same.

38.     For example, on or about November 23, 2020, an Omani company received an email from Qasemi, identifying himself as "Commander Rostam Ghasemi" and describing himself as "IRGC Qods Force Deputy." In the email, Qasemi stated that the cargo, Iranian crude oil, on a vessel chartered by the Omani company was moved to a second vessel without the authority of the IRGC, and demanded a "back-loading" operation be completed. Qasemi further stated that an individual affiliated with the transaction was helping the IRGC "bypass sanctions."

39.     On October 26, 2020, OFAC stated:

> NIOC, overseen by the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran. NITC, a subsidiary of NIOC, is responsible for the transportation of Iranian crude exports. **NIOC and NITC provide both the oil and tankers for the sale of Iranian oil by the IRGC-QF.** The cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF.
>
> NITC has also played a significant role in oil deals used to generate revenue for the IRGC-QF and Hizballah. NITC personnel coordinated with the IRGC-QF on the loading of oil provided by NIOC, and NITC Managing Director Nasrollah Sardashti (Sardashti) worked with Hizballah on logistics and pricing for oil shipments to Syria. Sardashti also worked with Qatirji Group representative Viyan Zanganeh (Zanganeh) and a senior IRGC-QF official to facilitate the shipment of millions of dollars of oil by NITC. In 2018, OFAC designated Syrian regime-affiliated Qatirji Group for facilitating fuel trades between the Syrian regime and the Islamic State of Iraq and al Sham (ISIS), including providing oil products to ISIS-controlled territory. As of early 2020, the Qatirji Group's Zanganeh continued to work closely with the IRGC-QF to coordinate NIOC's provision of millions of barrels of oil and petroleum products to be shipped to Syria, as well as millions of dollars in payments back to Iran. In mid-2020, Zanganeh continued to act as an intermediary between the IRGC-QF and a Syrian regime-affiliated business, arranging for the funding of the release of a seized vessel and additional shipments of fuel oil.

The Iranian Ministry of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC-QF's revenue generation scheme. In mid-2019, the Ministry of Petroleum arranged the loading of hundreds of thousands of barrels of oil for shipments to Syria, and in mid-2020 the IRGC-QF and senior regime officials coordinated to use the Ministry of Petroleum to procure U.S. dollars for the benefit of the IRGC-QF.

Furthermore, in order to obfuscate its involvement in shipping activity, NITC set up a front company in the United Arab Emirates (UAE), Atlas Ship Management. NITC officials also arranged to create a separate UAE-based front company, Atlantic Ship Management Company, ostensibly as an entity to replace Atlas Ship Management.

40.     According to the publicly available webpage for the Iranian Oil Terminals Company ("IOTC"), IOTC is a subsidiary of NIOC that runs the Bandar Mahshahr oil terminal. Specifically, the site states that IOTC "[i]s one of the companies under umbrella of National Iranian Oil Company is an operational, specialized and professional organization that has the duty of all reservation affairs, crude oil, oil products, liquefied gas and marine services export and import operations along with providing measurement and lab services. This important task is under implemented by aiming at support and sustained continuation of oil and gas production in the country in four operational zones of Kharg Oil Terminals . . . ." *See* https://www.iotco.ir/en/aboutus/introductioncompany. According to the corporation reporting service Orbis, IOTC is owned by the government of Iran.

41.     According to NIOC's website, NIOC itself sells Iranian petroleum products directly to buyers and cautions against dealing with individuals claiming to be NIOC brokers as NIOC does not use brokers.

42.     Therefore, there is probable cause to believe that vessels calling on Kharg Island oil terminal, and berthing in its anchorage, are receiving petroleum products owned by NIOC, an OFAC sanctioned entity.

### C.    IRAN'S USE OF FRONT COMPANIES

43.    Based on my training and experience, as well as my review of legally obtained email records, chat messages, and banking records in other cases, I know that Iran uses a network of front companies located around the world in order to avoid sanctions. When Iran utilizes a front company without overt links to the country through the assistance of foreign nationals, it becomes significantly easier for the front company to pass rudimentary due diligence checks by financial institutions to open and maintain bank accounts with banks outside of Iran. These companies are not overtly linked to Iran, allowing Iran to hide its financial activity by using foreign nationals and foreign entities to continue to access the U.S. financial system.

44.    Iran uses front companies to pay their counterparties in U.S. dollars. The use of these front companies generates significant revenue for the IRGC-QF. A large portion of the activity is conducted in U.S. dollars.

45.    The use of front companies and the practice of obfuscating the true origin of the Iranian cargo allows the IRGC-QF to access banking networks worldwide, including the U.S. financial system. Iran's tactics prevent banks from conducting appropriate due diligence resulting in the banks processing transactions that they otherwise would normally freeze, block, investigate, and/or decline.

### D.    USE OF THE U.S. FINANCIAL SYSTEM FOR THE TRANSFER OF IRANIAN OIL

46.    Virtually all U.S. Dollar transactions are processed through U.S. dollar bank accounts ("correspondent accounts") at banks in the United States ("correspondent banks"). Correspondent accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency

conversions, related to such foreign financial institutions. *See* 31 C.F.R. § 1010.605. Correspondent banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and to conduct currency conversions to/from U.S. dollars. It is through these correspondent accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

47.     According to the Department of the Treasury, the global financial system relies on correspondent banking relationships. Nearly all U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters. *See* 31 C.F.R. § 1010.605(f).   Additionally, I have reviewed email communications showing that IRGC-QF has designed a complex payment system to launder funds from the sale of Iranian oil back to the IRGC-QF and its leaders, typically through various front companies. In one such example, those payments were made in U.S. dollars and run through entities in the United States, causing the payments to be processed by U.S. banks. For instance, according to bank records, in July-July 2021, a Chinese refinery made multiple payments totalling approximately $27 million to a U.S. corporation, all of which were processed by a U.S. bank. Legally obtained email evidence and chat messages show that the U.S. corporation was acting as an intermediary for IRGC-QF leaders, and planning to send those same funds to the IRGC as proceeds of Iranian oil sold to the Chinese refinery.  The email messages show that IRGC-QF leaders were directly involved in setting up the payment scheme.

E.       **THE TARGET PROPERTY**

48.      According to the CS, BERG 1 (IMO 9262168) is a Very Large Crude Carrier (VLCC) flagged in Panama. The vessel has loaded oil at Kharg Island, Iran on seven occasions over the past two years. BERG 1 has transported at least 13.5 million barrels for ultimate delivery to China via STS transfers in the Riau archipelago. During the tenure of BERG 1's current ownership (as publicly reported), BERG 1 has only loaded oil in Iran. BERG 1 mostly loads at Kharg Island, but has also been seen engaged in STS as an oil cargo recipient in the Gulf of Oman off the coast of Iran. Below are three satellite images that the CS obtained, showing BERG 1 loading at Kharg Island, Iran during 2022.



2022-01-17 Middle East & Gulf        2022-03-23 Middle East & Gulf        2022-06-11 Middle East & Gulf

48.      According to the CS, on January 15, 2022, the BERG 1 appeared to have reached the intersection of Kuwait, Iraq, and Iran territorial waters, according to the reported AIS data for

19

the vessel.  Thereafter, the CS opined that the AIS data BERG 1 transmitted was false (also known as "spoofing") because satellite imagery confirmed that the vessel was in a different location.

49.     According to satellite imagery, on January 16, 2022, the BERG 1 was loading at the south berth (AKA berth 5) on the "T" jetty of Kharg Island, Iran. (As stated, BERG 1 was spoofing over AIS at the time.) The loading continued until January 18, 2022.



50.     Thereafter, on or about January 18, 2022, BERG 1 departed Iran and began reporting her true position over AIS, which was southbound heading away from Kharg Island. On or about January 18, 2023, BERG 1 reported a change in destination from KAZ to Singapore, then

to Singapore OPL, followed by a change in draft depth from 11.5 meters to 20.2 meters, then to
20.5m.

     51.     On February 2, 2022, the BERG 1 arrived in the Riau Archipelago[6] in order to carry
out Ship-to-Ship (STS) transfers of oil.

     a.     From February 15-17, 2022 BERG 1 was engaged in an STS transfer to deliver her
oil cargo to MARIA GRACE (IMO 9224271) in the Riau archipelago. No draft
changes were reported at this time by either of the two vessels.



     b.     From February 18-20, 2022 BERG 1 was engaged in another STS transfer to deliver
oil cargo to TJATSE (9248813) in the Riau Archipelago.

---

[6] The Riau Archipelago is a geographic term for the core group of islands within the Riau Islands
Province in Indonesia, located south of Singapore and east of Riau on Sumatra.



c.  On February 21, 2022, the BERG 1 reported a change in destination to Khor

Fakkan, U.A.E., and indicated her draft depth went from 20.5 meters (fully laden)

to 11 meters (empty of cargo/in ballast). Correspondingly, on February 28, 2022,

TJATSE reported a draft change from 8.8 meters (empty of cargo/in ballast) to 15.7

meters (fully laden), and on March 12, 2022, the MARIA GRACE reported a draft

change from 9.1 meters (empty of cargo) to 15.7 meters (fully laden).

52.    On March 12, 2022, the MARIA GRACE departed the Riau archipelago for Nipa

anchorage, Indonesia. As stated above, the vessel reported a draft change the same day.

Thereafter, MARIA GRACE departed from Nipa anchorage and headed towards the CS

PROSPERITY (IMO 9169691), which was anchored off Kukup, Malaysia. From March 15-18,

2022, the MARIA GRACE was engaged in an STS transfer delivering the Target Property to CS PROSPERITY off Kukup in the Strait of Malacca.



South of Kukup, Strait of Malacca; 1.27018° N, 103.44469° E; 2022-03-16

53.     On March 18, 2022, the CS PROSPERITY ended the STS transfer with MARIA GRACE at 09:12 UTC and, 71 minutes later, engaged in an STS with OKEANOS. On March 19, 2022, the CS PROSPERITY continued the STS to transfer the Target Property to the OKEANOS off Kukup in the Strait of Malacca. The image below shows the CS PROSPERITY engaged in the

STS transfer with OKEANOS. AIS transponders of both vessels documented them being in this location at this time.



South of Kukup, Strait of Malacca; 1.27027° N, 103.44689° E; 2022-03-19

54.     On March 21, 2022, the OKEANOS reported a change in draft from 9 meters (empty of cargo/in ballast) to 16 meters (laden) before ending the STS transfer and departing for Omisalj, Croatia via the Suez Canal.

55.     According to satellite imagery from CS and documentation provided by JANAF, on April 22, 2022, the OKEANOS arrived at Omisalj, Croatia docking at the OMI1 berth to deliver the oil cargo. The OKEANOS departed Omisalj, Croatia on April 24, 2022.

56.     According to documentation provided by JANAF, the Target Property unloaded from the OKEANOS was stored in tanks controlled by JANAF, where the Target Property remains.

### F.     FRAUDULENT PAPERWORK AND OTHER CONDUCT CONSISTENT WITH SANCTIONS EVASION

57.     As previously mentioned, Singapore-based Unicious Energy PTE. Ltd. was designated by the Department of Treasury on February 9, 2023. Unicious is owned by Mohamed Siddique Mohamed Sabil. Sabil also owns Geneva, Switzerland-based Unicious SA.

58.     According to documents provided to JANAF, Unicious SA was listed as the "Charter Party" of the OKEANOS at the time it obtained the Target Property.

59.     JANAF was presented with a series of documents related to the Target Property, which concealed the Iranian origin of the crude oil onboard OKEANOS. The documents alleged that the Target Property originated in Malaysia. Unicious SA presented this paperwork, which, as explained below, I believe to be falsified.

      a.   Unicious SA presented a Certificate of Origin, allegedly certified by the Malay Chamber of Commerce, stating that OKEANOS was loaded with 996,726 barrels of Malaysia Blend Crude Oil. The Certificate is dated March 20, 2022.

      b.   Unicious SA presented a Certificate of Quality dated March 22, 2022, describing the cargo as Malaysian Blend Crude Oil.

60.     Your affiant believes the Malaysian documents were falsified by Unicious SA and others in order to hide the true Iranian origin of the Target Property. I am aware from other investigations that it is typical for false certificates of origin and other paperwork to be presented in furtherance of Iranian oil transactions, in an attempt to hide the origin of the oil. Specifically, I have reviewed paperwork from multiple transactions showing certificates of origin which do not, in fact, comport with satellite imagery showing the loading of the oil in Iran. In several instances,

legally obtained email evidence showed that an employee at one country's Chamber of Commerce had been complicit in the production of false certificates.

61.     After the Target Property was deposited in Croatia, JANAF conducted independent testing on the Target Property. According to the CS, all crude oil has a "signature" of its chemical composition, the review of which can show where the oil originated.  NIOC lists on its website the chemical composition of its oil products.  The CS reviewed the test results and compared it to the table of crude oil used in the industry as well as NIOC's publicly-available information. After reviewing the test results from JANAF for the Target Property, the CS determined that Target Property is consistent with crude oil from Iran's offshore Forozan crude oil reserve. According to NIOC's website and industry information available to the CS, this type of crude oil reaches Kharg Island by pipeline from the Persian Gulf ahead of its seaborne export. After a review of the various crudes exported by NIOC, the CS opined that characteristics of the Target Property are consistent with Forozan crude oil, specifically Forozan crude oil's combination of API gravity and sulfur concentration.

62.     According to documentation provided to JANAF, Unicious SA engaged in a contract with Delta Oil, a Croatian company, related to the storage of the oil. Under this contract, Unicious SA provided a warranty that the Target Property was not subject to sanctions, including U.S. sanctions.  Delta Oil arranged for the storage of the Target Property through a contract with JANAF, in which Delta Oil also provided a warranty that oil deposited in JANAF's facilities would not be subject to sanction, including U.S. sanction. Based on the prior conduct of Unicious's owner in Iranian oil transactions, as described by OFAC, and the warranty provided by Unicious SA,

your affiant asserts there is probable cause to believe that Unicious SA engaged in the knowing presentation of sanctioned oil to the JANAF facility.

## V.   **ALL TARGET PROPERTY SUBJECT TO FORFEITURE**

63.     As described above, on or about April 22, 2022, and after the U.S. government designated NIOC, IRGC, and IRGC-QF, pursuant to counter-terrorism authorities, OKEANOS delivered Iranian crude oil to a storage facility in Croatia.

64.     The Iranian crude oil transferred from OKEANOS constitutes the Target Property.

65.     As described above, the Target Property is property of NIOC which is being sold on behalf of the IRGC-QF, a designated foreign terrorist organization. In transferring the Target Property for the purposes of sale, NIOC provided or attempted to provide resources to IRGC and IRGC-QF, in violation of 18 U.S.C. § 2339B(a)(1).

66.     The Target Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), as an asset of NIOC, an entity that engaged in a federal crime of terrorism – *i.e.*, providing material support to a designated terrorist organization, IRGC and IRGC-QF.

67.     Additionally, the Target Property provides NIOC with a source of influence over IRGC and IRGC-QF, within the meaning of 18 U.S.C. § 981(a)(1)(G)(i), because the Target Property was critical to furthering IRGC-QF's enterprise and profits.

68.     Additionally, the Target Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), because it provides the third-party companies involved with this illicit shipment a source of influence over NIOC, which is a designated entity that has engaged in a federal crime of terrorism – providing material support to a designated terrorist organization, IRGC and IRGC-QF.

69.     Additionally, the Target Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and Title 28, United States Code, Section 2461(c) as proceeds of money laundering committed in further of a violation of 18 U.S.C. § 2339B.

## VI.   REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

70.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Seizure Warrant. I submit that Assistant U.S. Attorney Karen Seifert, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## VII.  CONCLUSION

71.     Based on security concerns raised by the nature, ownership, and location of the Target Property, there exists reasonable cause to permit the execution of the requested warrant at any time of day or night.

72.     Based on the foregoing, I respectfully request that the Court find probable cause that:

a.  there has been a violation of 18 U.S.C. § 2339B, in that NIOC and others known and unknown have provided material support to IRGC and IRGC-QF, which is a designated foreign terrorist organization under U.S. terrorism sanctions; and

b.  that the Target Property is subject to seizure and forfeiture, pursuant to the above referenced statutes.

I respectfully request that the Court issue the proposed warrant related to the same.

Respectfully submitted,

Cindy R Burnham

Cindy Burnham, Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 10, 2023.

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA